**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**JENNIFER L. LAUGHLIN-DENECKE,**

                                        **Plaintiff,**                        **07-CV-0745A(Sr)**

**v.**

**ITT EDUCATIONAL SERVICES, INC.,**

                                        **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

        This matter was referred to the undersigned by the Hon. Richard J. Arcara, in

accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report upon

dispositive motions.  Dkt. #7.

        Plaintiff Jennifer Laughlin-Denecke brought this action on November 6, 2007

against defendant ITT Educational Services, Inc. ("ITT") seeking declaratory relief and

damages for discrimination in employment based on alleged violations of her rights

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq*.

("Title VII"), and the Americans with Disabilities Act ("ADA").[1]  Pending for report and

recommendation is ITT's motion for summary judgment dismissing the complaint in its

entirety.  Dkt. #32.  Upon consideration of the record as a whole, including the parties'

---

[1]The complaint also contained a cause of action based upon New York State Human Rights Law, N.Y. Exec. Law §290 *et seq*., but this cause of action was dismissed with prejudice by stipulation dated June 20, 2008, Dkt. #20, and ordered June 23, 2008.  Dkt. 23.

written submissions and oral arguments, it is recommended that the defendant's motion for summary judgment be granted.

## BACKGROUND

Plaintiff was hired on July 19, 2004, as Chair of the School of Drafting and Design at ITT's campus in Getzville, New York. She was interviewed and recommended for the position by Mark Onesi, ITT's Dean of Academic Affairs. Dkt. #27, ¶¶ 1-2; Dkt. #37. Mr. Onesi had previously served as Chair of the School of Drafting and Design until February of 2004, when he was removed because he lacked the requisite academic credentials. He then taught classes at ITT from February of 2004 until he was appointed Dean of Academic Affairs in April of 2004. Dkt. #37, ¶ 3. The person who held the position of Chair of the School of Drafting prior to Mr. Onesi had a bachelor's degree in interior design, which was deemed to be sufficient for the position. *Id.* at ¶ 33.

At the time she was hired, plaintiff held a bachelor of arts degree in English, a masters degree in special education, and had completed all but one semester of the course work for a bachelor's degree in mechanical engineering. Dkt. #27, ¶ 5; Dkt. #37, ¶ 4. Plaintiff concedes that prior to being hired, she indicated her willingness to complete her degree in mechanical engineering should it become a requirement to maintain her job. Dkt. #27, ¶ 7; *id.*, Ex. 1, pp. 24-25, 63.

Plaintiff was diagnosed in late September 2004 with viral meningitis associated with West Nile virus. Dkt. #27, Ex. 9, ¶ 1. She was hospitalized for a week, recuperated at home for a short time, and returned to work in mid- to late October 2004.

Dkt. #37, ¶ 10. Upon returning to work she continued to have difficulty with memory, spelling, and other cognitive deficits, but these problems had improved significantly by January 2005. Dkt. #27, Ex. 1, pp. 173-80.

In December 2004, Mr. Onesi had a conversation with plaintiff regarding her return to school to complete the course work necessary for her bachelor's degree in mechanical engineering, as they had discussed at the time she was hired. Plaintiff told Mr. Onesi she felt she needed additional time to recover from her illness before she returned to school to complete the degree. Dkt. #27, Ex. 1, pp. 25-26.

On March 2, 2005, Mr. Onesi sent plaintiff the following e-mail:

I need a status update on where you are in regards to completing your Mechanical Engineering Degree requirements. Is this something you will be able to start/complete soon? Remember, we discussed this when you started and I am in need of a status update since I will most likely be asked soon by Lester [Burgess, ITT's Director], possibly HQ, and possibly ACICS [Accrediting Council for Independent Colleges and Schools]. Thanks.

Dkt. #27, Ex. 5, p. 2. Plaintiff responded by e-mail dated March 7, 2005, stating:

I will look into this further, but to the best of my knowledge the very soonest I will be able to go back is May or June. If I go back for summer classes though I will have to be in class everyday. Since this is not likely to work with my schedule here, the earliest I'd be likely to go back would be August or September. Since this is pretty far off, I'm not really doing anything about it at this time. I will in a few months.

*Id.*, Ex. 5, p. 4. By e-mail dated April 14, 2005, Mr. Onesi advised plaintiff that:

Based on your recent e-mail detailing your future school plans, we may have a problem. Please see me so we can discuss this.

*Id.* at p. 5.

On May 26, 2005, plaintiff went to see a neurologist, Dr. Sherry Witham-Leitch, M.D. Dr. Witham-Leitch administered "general cursory" physical and neurological

examinations to plaintiff, all of which yielded "essentially normal" results.  Dkt. #27, Ex.

6; *see also* Dkt. #27, Ex. 2, at 13-21.  In a letter dated that same day, Dr. Withiam-

Leitch advised plaintiff's general practitioner, Dr. Han Chang, that plaintiff's "general

physical and neurologic exams were normal . . . ," but she scheduled an MRI, EEG, and

neuropsychological testing to rule out the possibility of "organic brain syndrome" or

"[c]omplex partial seizure" as a result of the previous viral meningitis.  Dkt. #27, Ex. 6, p.

8.

By "Letter of Notification" dated June 29, 2005, Mr. Onesi advised plaintiff of the

following:

> When you began employment with ITT Technical Institute, Getzville, you
> and I discussed the need for you to complete the requirements for your
> Mechanical Engineering degree.  At that time, I informed you that
> beginning classes to complete the degree and eventually having the
> degree, was a requirement for retaining your position as the Chair, School
> of Drafting and Design.  I asked for a status report in the December 2004
> time frame and you had not yet checked into what requirements were
> necessary to complete the degree. . . .
>
> I realize now that I should have formally recorded this initial conversation
> about the degree requirements.  As a result, at this time I am outlining
> your requirement for continued employment as the Chair, School of
> Drafting and Design.
>
> > a.     You must enroll in classes designed to complete your Mechanical
> > Engineering degree, or a degree compatible with or appropriate for
> > your position, not later than the September/Fall 05 Semester.
>
> \*   \*   \*
>
> If you do not expect to complete an appropriate degree, decide not to
> pursue degree completion, or cannot complete the degree program in a
> reasonable time, you may be removed from your position as Chair, School
> of Drafting and Design.  If removed from the Chair position, you will be
> afforded every opportunity for continued employment with ITT Technical
> Institute in the Academic Affairs Department, most likely as an instructor.
> Employment as an instructor will most likely be as an Adjunct since your
> primary background is in General Education (GE).

Dkt. #27, Ex. 5, p. 6.  Plaintiff signed the letter, thereby signifying that she had received

the letter and understood "the consequences for failure to adhere to its contents."  *Id.*

Plaintiff's one-year "Performance Planning and Evaluation Review," completed

on July 29, 2005, indicated an overall performance level of "Standard."  Dkt. #27, Ex. 5,

p.10.  She was "meeting her duties as Chair . . . ," and had "handled reentry

responsibilities very well."  *Id.*   In the section of the evaluation entitled "Development

Plans," plaintiff was advised that:

> She must begin a degree completion program not later than September
> 2005 in order to complete a degree which will meet the requirements of
> her position as Chair.  The degree requirement was agreed upon as a part
> of employment since it is necessary to be fully qualified as the Chair of the
> Drafting and Design Department.  She must also be more proactive in
> completing scheduling assignments for instructors and ensuring that all
> instructors are administratively prepared to start classes before the start
> date.

*Id.*  Plaintiff signed the evaluation on July 29, 2005.  *Id.*

Meanwhile, on June 23, 2005, plaintiff was evaluated by Dr. Michael Santa

Maria, Ph.D., a specialist in clinical neuropsychology.  In a letter to Dr. Withiam-Leitch

dated August 2, 2005, Dr. Santa Maria reported the results of comprehensive

neuropsychological testing which revealed a "Mild Neurocognitive Disorder" associated

with viral meningitis, "predominantly affecting capacity for sustained attention and

information processing speed."  Dkt. #39, Ex. 4, p. 34.  Dr. Santa Maria further

commented:

> Although there is evidence of compromise in cognitive efficiency, I did not
> find clear evidence of a cognitive or psychological condition that in my
> judgment would preclude her from continuing in her current line of work.
> However, a) she is finding the work more stressful than in the past and
> she and I discussed options should she decide to make a career change,
> and b) if in fact she is let go from her current job (due to cognitive

inefficiencies mentioned in her recent past performance review), my recommendation to the Board of Disability Determinations would be to consider her eligible for short-term Disability in association with persisting meningitis-related cognitive deficits; within several months she would be expected to be able make a career change and continue with full time employment.

. . . I understand that Ms. Denecke may be required to take some high level engineering classes in association with her current job. Cognitive deficits that were identified would certainly compromise her efficiency in taking and passing classes of this nature. Strong consideration should be given to waiting 5-6 months or more to commence classes of this nature. Further cognitive recovery is expected over this time.

*Id.* at pp. 34-35.

On August 9, 2005, Mr. Onesi sent an e-mail to David Luce, Regulatory Affairs Manager in ITT's Indianapolis headquarters, inquiring as to the educational background necessary for the Drafting and Design Chair. He noted that plaintiff had a masters degree in special education and a bachelor's degree in English, as well as four and-a-half years toward a five-year degree in mechanical engineering, and that when she was hired for the chair position she agreed to "complete courses towards finishing her Mechanical Engineering degree." Dkt. #27, Ex. 5, p. 12. Mr. Onesi further advised:

Now she has requested that she only be required to complete an Associates Degree in Mutli Media which is part of the School of D&D. This would give her a degree in one aspect of D&D and then be combined with the already completed Engineering courses should [give] her around 50 hours of course work associated with CDD and MM.

But, is an Associates degree combined with the other background enough to meet any requirements? Or is a BS degree required in a technical field?

*Id.* Mr Luce requested transcripts and resumes to review and then replied:

The short answer to your question is that bachelor's degrees are required where they are available. In the case of a D and D chair, the individual should possess a bachelor's degree in the area that they supervise. We

have found, however, that it's often quite difficult to find a D and D chair that has expertise in both drafting and design and multimedia. I am concerned about your situation because the individual does not appear qualified to be a chair in either area. I believe that you have a serious situation on your hands here, one that ACICS and NYSED [New York State Education Department] would find unacceptable. I would question why the individual was appointed as chair to begin with since she does not appear to have solid experience or educational credentials in either area. Given that the individual received mostly Ds and Fs in the Mechanical Engineering courses that are related to drafting and design and that she does not currently possess a degree in multimedia or design, she is not qualified as chair.

*Id.* at pp. 12-13.

Dr. Withiam-Leitch saw plaintiff again on August 15, 2005. In a note dated that same day addressed "To Whom It May Concern," Dr. Withiam-Leitch stated that plaintiff "is under treatment for meningitis from West Nile Virus. She has documented cognitive deficits. She is unable to return to school at this point." Dkt. #39, Ex. 4, p. 28.

On August 24, 2005, Lester Burgess, Director of ITT's Getzville Campus, sent Mr. Luce an e-mail indicating that he had reviewed plaintiff's file and concurred that her credentials did not qualify her for the chair position. Dkt. #27, Ex. 7, p. 13. Mr. Burgess continued:

As for moving her to instructor, Math and Comp are the options, but we already have them scheduled with instructors of higher capability. FYI, when she was originally hired, she was told and she agreed that she must return to school and obtain her engineering degree. After waiting over a year for her to do this we arrive at this juncture. Now, on 8/15/2005 she has produced a doctor's excuse that indicates she is under his care for meningitis from the West Nile Virus and can not attend school. I think some advice from HR would be welcomed toward termination as an end result to this matter.

*Id.*

Nina Esbin, Senior Vice President of Human Resources for ITT, received a copy of Mr. Burgess' August 24, 2005 e-mail. Ms. Esbin conducted a review of plaintiff's personnel file, which included the June 29, 2005, Letter of Notification and the Onesi/Luce/Burgess e-mail chain described above, and determined that plaintiff "was not qualified for the Chair position and that [her] termination was warranted." Dkt. #27, Ex. 8, ¶ 7.

In a memorandum dated September 7, 2005, Mr. Onesi informed plaintiff as follows:

> As you are aware, when you were employed as a Chair, School of Drafting and Design in July 2004, we had an oral agreement that you would complete your Mechanical Engineering degree, as it was an ACICS degree requirement for your position. The consequences of ITT Technical Institute employing individuals without the necessary degree requirements can range from deferred reaccredi[t]ation renewals to loss of accreditation and subsequent campus closures.
>
> In December 2004, I asked you for a status on your progress toward the degree completion and you had not taken any action toward meeting this job requirement. On July 29, 2005, you received a memo from me that stated you were required to enroll in classes designed to complete your Mechanical Engineering degree, or a degree compatible with, or appropriate for, your position, not later than the September/Fall 05 Semester. The memo indicated that if this requirement were not met, you would be removed from your position as Chair, School of Drafting and Design.
>
> Based upon the facts that you have not enrolled in any courses as directed by me in the July 29th memorandum to you, nor does it appear that you have any plans to do so, in light of the physician's note you presented to me dated August 15, 2005, the company has decided to terminate your employment with the company for failing to meet an essential element of the job, effective today, September 7, 2005 (considered your "Termination Date").

Dkt. #27, Ex. 8, p. 14.

On January 17, 2006, plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR") charging defendant with employment discrimination based on age, sex, and disability.  Dkt. #1, Ex. 1.  She claimed that she was terminated for not completing the engineering degree after she provided ITT with a doctor's note indicating she could not return to classes due to her cognitive problems.  She also claimed that during her July 2005 performance review Mr. Onesi stated "You're good at your job, but you're too young and too female for your position . . . ," and that Mr. Onesi took no corrective action when she complained about having received sexually threatening voice mail messages at work.  *Id.* at pp. 1-2.

On June 7, 2007, the NYSDHR issued a "Determination and Order After Investigation" finding no probable cause to believe that defendant had engaged in the discriminatory practice complained of.  Dkt. #27, Ex. 5, p. 14.  The NYSDHR found:

> [Plaintiff] was hired with the expectation that she would complete her mechanical engineering degree.  She failed to do so, and medical documentation [she] provided [to defendant] did not indicate a time at which it was expected she would be able to do so.  [Defendant] tried to accommodate [plaintiff's] request to substitute a different type of degree; however, due to concerns regarding their accreditation, they were unable to do so.
>> [Defendant] terminated [plaintiff] for legitimate business reasons, failure to complete educational requirements of the position.

*Id.*

On August 7, 2007, the Equal Employment Opportunity Commission ("EEOC") issued a "Dismissal and Notice of Rights" letter informing plaintiff that it had adopted the findings of the NYSDHR, and that plaintiff had ninety days to file a lawsuit based on federal law in state or federal court.  Dkt. #1, Ex. 1.  Plaintiff filed this action within the ninety-day period, claiming that ITT terminated her employment without reasonably

accommodating her documented cognitive deficits, in violation of the ADA.  Dkt. #1, ¶¶

11-15.  She also claims that Mr. Onesi's comment about being "too young and too

female" for her position, as well as his failure to take any action to address her

concerns about sexually threatening voice mails and late night work assignments,

constitutes a pattern and practice of discrimination on the basis of sex in violation of

Title VII.  *Id.* at ¶¶ 16-23.

Following discovery and unsuccessful mediation efforts, ITT moved for summary

judgment dismissing the complaint in its entirety on the grounds that plaintiff cannot

meet the requirements for establishing a *prima facie* case of either disability

discrimination under the ADA or gender discrimination under Title VII.  Plaintiff

responded to the motion, and the undersigned heard oral argument on June 30, 2009.

For the reasons that follow, it is recommended that ITT's motion be granted.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A fact is considered to be

"material" only if it "might affect the outcome of the suit under the governing law . . . ,"

and a dispute regarding a material fact is considered to be genuine "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bryant v Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

In making its determination on a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162,167 (2d Cir. 1991). The moving party has the initial burden of "demonstrating the absence of a genuine issue of material fact, [whereupon] the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). The party seeking to defeat a motion for summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

The court's role in ruling on a summary judgment motion is not to resolve issues of fact, but rather to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When "little or no evidence may be found in support of the nonmoving party's case . . . [and] no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment

is proper." *Gallo v. Prudential Resid. Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

In support of its motion for summary judgment, ITT contends that plaintiff cannot meet the requirements for establishing a *prima facie* case of discrimination under either the ADA, based on disability, or Title VII, based on sex. These contentions are addressed in turn.

**Americans with Disabilities Act**

It is not a matter of dispute in this case that plaintiff suffers from cognitive deficits (such as problems with memory, concentration, and focus) as a result of having contracted West Nile virus in September 2004. She claims ITT discriminated against her by terminating her employment in September 2005 without accommodating her request for reasonable alternatives to satisfy the academic requirements for the position of Chair of the Department of Drafting and Design. Defendant contends that, based upon the undisputed facts in the record following discovery, plaintiff cannot meet the legal standards for establishing a claim of either discriminatory discharge or failure to accommodate in violation of the ADA.

Employment discrimination claims brought pursuant to the ADA are evaluated by applying the same burden-shifting test developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze employment discrimination claims brought under Title VII. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002), *cert. denied*, 537 U.S. 813 (2002). Using this familiar framework, courts first examine whether the plaintiff is

able to establish a *prima facie* case of disability discrimination.  If the plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action at issue.  If the employer meets its burden, the burden of production shifts back to the plaintiff to demonstrate that the employer's explanation was a pretext for discrimination.  *See Kloupte v. MISYS Intern. Banking System*, 251 Fed. Appx. 59, 60 (2d Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802, 804)).

The ADA prohibits "covered" employers from discriminating against qualified individuals with a disability with respect to conditions of employment, including hiring, advancement, discharge and compensation.  42 U.S.C.A. § 12112(a).  The ADA also prohibits employers from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ."  42 U.S.C. § 12112(b)(5)(A).

In recognition of these separate prohibitions, the courts have developed slightly different standards for evaluating *prima facie* claims of discriminatory discharge and failure to accommodate.  To establish a *prima facie* case of discriminatory discharge under the ADA, plaintiff must demonstrate that: (1) the employer is covered by the statute;[2] (2) plaintiff suffers from a disability as defined by the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without

---

[2]Defendant does not dispute that it is covered by the ADA.

reasonable accommodation; and (4) she was fired because of her disability. *See Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001); *see also Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998); *Bonilla v. Boces*, 2010 WL 3488712, at *4 (W.D.N.Y. Sept. 2, 2010). To establish a *prima facie* case of discrimination based on an employer's failure to accommodate, the plaintiff must demonstrate that: (1) she is an individual with a disability as defined by the ADA; (2) the employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the job sought; and (4) the employer refused to make such reasonable accommodation. *See Lovejoy-Wilson v. NOCO Motor Fuel*, 263 F.3d 208, 216 (2d Cir. 2001).

Thus, to prevail on either a claim of discriminatory discharge or failure to accommodate, plaintiff must first show that she qualifies as an individual with a disability under the ADA. *See Wega v. Center For Disability Rights Inc.*, 2010 WL 3933563, at *1 (2d. Cir. Oct. 8, 2010). The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1)(A) (2005).[3] In *Bragdon v. Abbott*, 524 U.S. 624 (1998), the Supreme Court established the following three-step process to evaluate a plaintiff's "disability" qualification by determining: (1) whether plaintiff had an "impairment;" (2) whether the impairment affected a "major life activity" within the meaning of the ADA; and (3) "tying the two statutory phrases together, we ask whether

---

[3] The statute also defines "disability" to include "a record of such an impairment; or . . . being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1)(B), (C). Plaintiff does not argue here that she meets either of these definitions of disability.

-14-

the impairment substantially limited the major life activity."  *Id.* at 631; *see Ramirez v. New York City Bd. of Educ.* 481 F. Supp. 2d 209, 217-18 (E.D.N.Y. 2007).

In this case, plaintiff claims that her mental impairment–cognitive deficits as a result of viral meningitis associated with West Nile virus–substantially limits the major life activities of "thinking, concentrating, and interacting with others."  Dkt. #40, p. 21. Defendant does not seriously dispute that plaintiff suffered from this cognitive impairment at the time of her discharge from employment in September 2005, or that the activities of thinking, concentrating, and interacting with others are considered to be major life activities within the meaning of the ADA.[4]  However, defendant contends that the deposition testimony, medical records, and other evidence elicited during discovery fails to establish that plaintiff's cognitive impairment substantially limited any of the identified activities.

As noted by the Second Circuit:

> Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.  Thus, in assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities.

*Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d. Cir. 1998) (emphasis in original) (citing *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995) ("not every

---

[4]Indeed, the statute was amended in 2008 to add an express definition of "Major life activities" which includes "concentrating, thinking, [and] communicating . . . ." 42 U.S.C. § 12102(2)(A) (effective Jan. 1, 2009).  The amendments, commonly referred to as the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. 110-325, substantially broadened the definition of "disability" under the law, and explicitly overturned several Supreme Court rulings which had strictly applied the statutory definitions of the terms "substantially limits" and "major life activities."  However, the federal district and circuit courts (including the Second Circuit) have held almost universally that the ADAAA does not apply retroactively, and that the courts must apply the statutory definitions in place at the time of the events alleged in the complaint.  *See, e.g., Ragusa v. Malverne Union Free School Dist.*, 381 Fed. Appx. 85, 87 n. 2 (2d Cir. June 21, 2010) (citing cases)

impairment that affect[s] an individual's major life activities is a substantially limiting

impairment").  In making this distinction, the courts commonly rely on guidance from the

EEOC regulations, which define the term "substantially limits" to mean:

> (i)  Unable to perform a major life activity that the average person in the
> general population can perform; or
>
> (ii)  Significantly restricted as to the condition, manner or duration under
> which an individual can perform a particular major life activity as
> compared to the condition, manner, or duration under which the average
> person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  "In other words, the ADA protects only a limited class of

persons–individuals who suffer from impairments significantly more severe than those

encountered by ordinary people in everyday life."  *Aquinas v. Federal Express Corp.*,

940 F. Supp. 73, 77 (S.D.N.Y. 1996), *quoted in Sussle v. Sirina Protection Systems

Corp.*, 269 F. Supp. 2d 285, 300 (S.D.N.Y. 2003).

> The regulations further provide:
>
> The following factors should be considered in determining whether an
> individual is substantially limited in a major life activity:
>
> (i)  The nature and severity of the impairment;
>
> (ii)  The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or
> long term impact of or resulting from the impairment.

 29 C.F.R. § 1630.2(j)(2).  *See Gentile v. Potter*, 509 F. Supp. 2d 221, 236 (E.D.N.Y.

2007) (considering these factors "pursuant to the substantial limitation calculus").

Applying these factors to the record presented in connection with defendant's

summary judgment motion, the court finds insufficient evidence to establish that

plaintiff's cognitive deficits significantly restricted the condition, manner or duration

under which she could perform the major life activities of thinking, concentrating, or interacting with others as compared to the restrictions encountered by ordinary people in everyday life.   With respect to the proof regarding the nature and severity of her impairment, plaintiff testified at her deposition that when she returned to work in October 2004 after recovering from her bout with West Nile virus, she was able to fully perform her job duties but found herself having to write down appointments, make prioritized lists of specific job duties, and generally having to approach things from a more organized perspective.  Dkt. #27, Ex. 1, at 89-90.  She was generally able to drive, shop, do household chores, maintain personal hygiene, read, watch and understand the content of TV programs and movies, listen to CDs, visit with friends, and perform other ordinary cognitive activities which the average person in the general population could be expected to perform.  *Id.* at 161-69.

The deposition testimony and medical records provided by plaintiff's treating sources confirm that plaintiff's cognitive impairment did not limit her ability to think, concentrate, or interact in a manner that could be considered by a rational jury as significantly more severe than the limitations generally encountered by ordinary people in everyday life.  For example, Dr. Withiam-Leitch reported the results of her general physical and neurological examinations of plaintiff in May 2005 as "essentially normal." Dkt. #27, Ex. 6, pp. 6, 8; *see also id*., Ex. 2, pp. 11-21.  When she examined plaintiff again in August 2005, plaintiff's attention and concentration were reported as normal. Dkt. #27, Ex. 2, p. 23.  The MRI of her brain showed no abnormalities.  *Id.* at pp. 21-22.

Dr. Santa Maria's comprehensive neuropsychological testing of plaintiff, which took place in June 2005, revealed no clear evidence of a cognitive or psychological

condition that, in Dr. Santa Maria's judgment, would preclude plaintiff from continuing in her current line of work–including teaching college level courses in English and math. Dkt. #39, Ex. 4, p. 34; Dkt. #27, Ex. 3, pp. 31-32.  Dr. Santa Maria's overall impression was that plaintiff had a "mild" neurocognitive disorder associated with viral meningitis, which predominantly affected her capacity for sustained attention and the speed of processing information.  *Id.*  While he expressed his concern about plaintiff's ability to successfully manage "high level engineering classes" at the time of his August 2005 report, Dr. Santa Maria expected "[f]urther cognitive recovery" which would allow plaintiff to resume classes within five or six months.  Dkt. #39, Ex. 4, pp. 34-35.

Dr. Withiam-Leitch testified at her deposition that she had no reason to disagree with Dr. Santa Maria's findings and conclusions regarding the level of plaintiff's cognitive functioning, which were based on objective testing "comparing [plaintiff] to the general population."  Dkt. 27, Ex. 2, pp. 44-45.  This includes the opinion that plaintiff could continue teaching math and English courses at ITT, which Dr. Withiam-Leitch acknowledged required "high level cognitive function."  *Id.* at pp. 73-74.

With respect to duration and long term impact, the proffered evidence is clear that plaintiff's cognitive impairment had significantly improved by the Spring of 2005.  It is beyond dispute that at the time of her discharge from employment in September 2005, whatever cognitive deficits remained did not substantially limit her ability to engage in most ordinary activities of everyday life (driving, shopping, etc.), or her ability to perform her regular duties at work at a "[c]ompetent, normal, and expected level . . . ."  Dkt. #27, Ex. 5, p. 9 (July 2005 Performance Review, defining "Results at Standard").  As already discussed, Dr. Santa Maria indicated (and Dr. Withiam-Leitch

agreed) that as of August 2005 plaintiff was able to meet the cognitive demands of her job, and it was likely that further recovery would allow her to resume her undergraduate course work by early 2006.

Based upon this court's review of the undisputed evidence presented by way of the parties' submissions, plaintiff has failed to demonstrate that at the time her employment was terminated her cognitive impairment significantly restricted her ability to think, concentrate, or interact with others as compared to the ability of the average person in the general population to perform those same major life activities. Accordingly, the court finds that plaintiff cannot meet her *prima facie* burden to show that she qualifies as an individual with a disability within the meaning of the ADA, and therefore no rational juror could find in plaintiff's favor on her claims based on either discriminatory discharge or failure to accommodate.

However, even assuming the proffered evidence is sufficient to create a genuine issue for trial with respect to whether plaintiff's cognitive deficits significantly limited a major life activity, plaintiff cannot show that she was "otherwise qualified" to continue in the position of Chair of the School of Drafting and Design. In this regard, the ADA defines the term "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The EEOC regulations provide further guidance:

> Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.

29 C.F.R. § 1630.2(m).

Thus, to be considered "otherwise qualified" for the position of Chair of the School of Drafting and Design, plaintiff must demonstrate that she satisfied "the requisite skill, experience, education and other job-related requirements" of the position. *Misek-Falkoff v. I.B.M. Corp.*, 854 F. Supp. 215, 226 (S.D.N.Y. 1994) (citing *School Bd of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17 (1987)), *aff'd*, 60 F.3d 811 (2d Cir. 1995); *see also McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 98 (2d Cir. 2009) (citing cases). According to the Second Circuit, "the plaintiff bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question." *Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) (citing cases).

Based on the undisputed proof presented by way of the parties' submissions on summary judgment in this case, plaintiff cannot meet this burden. Although she contends that completion of her mechanical engineering degree was not imposed as a requirement for her position until well after she was hired, the case law is clear that the relevant time for determining whether the plaintiff is a "qualified individual with a disability" is at the time of discharge or other adverse employment decision. *See Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998), *cert. denied*, 526 U.S. 1144 (1999); *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000). In any event, there is no dispute that plaintiff was aware at the time she was hired that it was likely she would be required to complete the course work necessary to attain her mechanical engineering degree in order to remain in the chair position. Likewise, there is no dispute that she discussed the degree requirement with her supervisor in December 2004, and again in March and April 2005. The requirement

was reduced to writing in both the June 29, 2005 "Letter of Notification" and the July 29, 2005 "Performance Planning and Evaluation Review."  Plaintiff signed both documents, indicating her understanding that failure to enroll in classes by the Fall 2005 semester to complete the mechanical engineering degree, "or a degree compatible with or appropriate for" the chair position, could result in her removal from the chair position. Dkt. #27, Ex. 5, p. 6.

Furthermore, while the determination whether a particular requirement (such as attainment of appropriate educational credentials) is essential to the proper performance of a job is based on a consideration of several factors, *see Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998) (factors relevant to determining whether a job function is essential include, *inter alia*, employer's judgment; written job descriptions; amount of time spent on the job performing the function; consequences of not requiring plaintiff to perform the function; work experience of past employees in the job; and/or work experience of current employees in similar jobs (citing 29 C.F.R. § 1630.2(n)(3)), the court must give substantial deference to the employer's judgment.  *McBride*, 583 F.3d at 98.  Here, the testimony and evidence presented in the parties' submissions, as discussed above, provides the court with ample support to accord substantial deference to ITT's determination that plaintiff's attainment of a bachelor's degree in the area of academic study she was charged with supervising was essential to the proper performance of her job.  Indeed, in the absence of any countervailing showing as to the other pertinent factors, any dispute in this regard must be resolved in ITT's favor.

Based upon this review of the record in light of the pertinent statutory, regulatory and case law requirements, the court finds that plaintiff has failed to come forward with sufficient evidence to make a *prime facie* showing that, at the time she was discharged from her employment with defendant, she suffered from a substantially limiting impairment or satisfied the educational requirements which were deemed essential to proper performance of her position. Accordingly, no rational jury could find in plaintiff's favor on her claim for relief under the Americans with Disabilities Act, and defendant is entitled to summary judgment dismissing this claim.

**Title VII**

Plaintiff also claims that ITT discriminated against her because of her sex in violation of Title VII, as evidenced by Mr. Onesi's comment that she was "too young and too female" for the position of Chair of the School of Drafting and Design, and by failing to take any steps to address the sexually threatening telephone calls she received at work. Defendant moves for summary judgment dismissing this claim on the ground that the facts discovered in the case fail to establish a *prima facie* claim of sex discrimination under Title VII.

Title VII of the Civil Rights Act of 1964 provides that it is an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or

national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).

As mentioned above, claims of employment discrimination brought under Title VII are analyzed using the *McDonnell Douglas* burden-shifting framework.  To establish a *prima facie* case of discrimination under Title VII, plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination.  *See Ruiz v. County of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).  Although the plaintiff's burden in presenting evidence to support a prima facie case is "*de minimis . . .*," *Abdu-Brisson v. Delta Air Lines, Inc.* 239 F.3d 456, 467 (2d Cir.), *cert. denied*, 534 U.S. 993 (2001), "[n]onetheless, a plaintiff's case must fail if she cannot carry this preliminary burden." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).

Defendant contends that plaintiff cannot establish a *prima facie* violation of Title VII because she cannot show that she qualified for the position she held at the time she was discharged.  As demonstrated by the discussion above regarding plaintiff's *prima facie* case of disability discrimination, the court agrees with defendant's assessment that the proof in the record on summary judgment fails to establish plaintiff's qualification for the position of Chair of the School of Drafting and Design.

The proffered evidence is also insufficient to establish that the discharge took place under circumstances giving rise to an inference of discrimination.  Instead, the undisputed proof makes it clear that plaintiff was hired for the chair position with the understanding that she would need to complete the remaining semester of

undergraduate course work for her degree in mechanical engineering. She was repeatedly advised that completion of this degree, or a compatible degree related to her area of supervision, would be required in order for her to remain in the chair position. She agreed in writing, in both the June 29, 2005 Letter of Notification and the July 29, 2005 Performance Planning and Evaluation Review, to enroll in classes by September 2005, but failed to do so.

The record also establishes that, when faced with these circumstances, ITT undertook several levels of internal administrative review of plaintiff's employment file and determined that, without a bachelor's degree in the area of her supervision (*i.e.*, either drafting and design or multimedia), plaintiff was not qualified for the chair position, presenting "a serious situation . . . that ACICS and NYSED would find unacceptable." Dkt. #27, Ex. 5, p. 13. There is nothing in this record that could be considered by a rational juror as sufficient to raise a reasonable inference that ITT's decision to discharge plaintiff was based on her sex. Plaintiff cites the comment made by Mr. Onesi during the July 2005 performance review that plaintiff was "too young and too female" for the chair position. Apart from any genuine dispute about whether Mr. Onesi actually made this comment, the courts "have consistently concluded that a single, isolated inappropriate comment is generally insufficient to engender a reasonable belief that a Title VII violation has occurred." *Abeln v. Ultra Life Batteries*, 2009 WL 857497, at *2 (W.D.N.Y. Mar. 30, 2009) (collecting cases).

Based on this review and analysis, the court concludes that even if the evidence in the record could be viewed as sufficient to make out a *prima facie* case of sex discrimination, defendant has articulated a legitimate, non-discriminatory reason for

terminating plaintiff's employment–namely, her failure to satisfy the educational requirements deemed essential to proper performance of her position–and plaintiff has failed to come forward with any showing that this reason is a mere pretext for actual discrimination.  Accordingly, because the evidence to support plaintiff's case of sex discrimination is so slight, no rational jury could find in her favor on her Title VII claim, and there is no genuine issue of material fact to preclude a grant of summary judgment in defendant's favor dismissing this claim as a matter of law.

<u>**CONCLUSION**</u>

Based on the foregoing, it is respectfully recommended that defendant's motion for summary judgment (Dkt. #32) be GRANTED in its entirety, and that plaintiff's complaint be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

**DATED:**     **Buffalo, New York**
            **December 7, 2010**

                              *S/ H. Kenneth Schroeder, Jr.*
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**